The Honorable Judge is the United States Court of Appeals, standing before the Southern Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Good morning, everyone. We're here today for a single case. The Court calls Appeal 25-1487, Joshua Wright v. Angela Shumate et al. We'll begin with oral argument on behalf of the appellant, Ms. Barbellucci. Thank you. May it please the Court, counsel. Plaintiff's second amended complaint describes a child who was subjected to beatings that increased in severity from whippings on the bottom to a beating so severe that it killed him. We know that the severity of the abuse inflicted on J.W. increased in the worst possible way. We can also infer from the complaint allegations that something caused or emboldened J.W.'s abuser, his mother's live-in boyfriend, Tracy Thomas, to inflict the fatal beating on J.W. And unless it can be said with certainty that the State Defendant's actions did not cause the increase in danger to J.W., the dismissal of the complaint should be reversed. Doesn't that flip the burden to say it must be done, they must show, isn't it the plaintiff's burden to show the affirmative act and a change in that? Yes, but under the rigorous standards under Rule 12b-6, if the reasonable inferences can be drawn from the complaint that the acts of the defendants could have caused the fatal abuse, then they should be liberally construed in favor of the plaintiff. And I would argue here the District Court's reading of this complaint was extremely rigid and strict as opposed to liberal. There were a multitude of facts alleged from which a court and a jury could reasonably conclude that the acts of the defendants played a role in increasing the danger to J.W. by emboldening his abusers. When DCFS intervened, took actions, but then ultimately closed the case with no action against Thomas. So even though they reached an indicated finding of abuse, there were credible allegations of abuse, they closed their case, they told the abusers they were closing their case, and there were no ramifications to the abusers. Leaving the abusers to think, well, we got away with it and we can do whatever we like now. And as the Department of Children and Family Services, I'll refer to that as DCFS if that's acceptable to the court. The DCFS procedures that are alleged in the complaint also spell out in great detail that certain actions taken by social workers investigating abuse claims can and are known to lead to retaliation, increases in anger, increases in the abuser's loss of control over a situation. These are very well-documented psychological phenomena that DCFS employees are trained about. And here, as we've alleged, one DCFS worker engaged in one of those acts by conducting an in-home interview in front of JW's suspected abusers. From there, the investigators took no action for approximately two months, so leaving JW in a home unprotected after they'd already committed an act that is known to increase the danger to a child. Then, once they did interview the children in the safer setting, the school, the investigator, defendant Shumate, learned additional information that should have raised a red flag. The children were whipped on the bottom, there was violence against the mother, and the children had called the police out of fear for their safety. So we have new facts that the investigators obtained that were then ignored. Maybe they weren't ignored on the papers, because an indicated finding of abuse was written in the file, but nothing took place. And the worst part is investigators Shumate classified these children as safe and said, affirmatively said, that they felt safe in the home, despite what the children had told her in the school interview. So those categorizations of children as being safe trigger a chain of events which will be fleshed out in discovery if the case is allowed to proceed. The categorization of the children as safe, the indication that they felt safe in the home, the decision not to complete a paramore checklist, which is imperative when a biological mother lives with a live-in paramore, the choice not to conduct that, the child to put false information in the child safety assessment document, all led to, you know, you follow a decision tree, and the ultimate result was no action was taken to protect JW. If there was abuse going on prior to the actions of the DCFS, abuse during and abuse after, what is the connection, plausibly alleged in any of the complaints that were admitted, that the actions of the DCFS increased or changed that? The evidence of that that's alleged in the complaint is, first and foremost, the initial hotline call to DCFS reported domestic violence against the mother and suspected neglect of the children. So the initial call was only reporting suspected neglect of the children, not fatal beatings, nothing in that realm. The next indication of a causal connection is that the complaint alleges that Mr. Thomas had lived in the family home for three years before JW was fatally beaten. So in three years' time, there was no indication given to the public or at least to DCFS that JW or any child in the home was being beaten severely. The only information was that there was possible neglect and whippings on the bottom. The mere fact that the beatings increased so severely in the 81-day period of time, because there's a time element that's been argued here. From the date that DCFS told the abusers that they were closing their file and taking no further action, only 81 days passed, and that was when Mr. Thomas fatally abused JW. So I think the increase in danger is shown from the fact that, A, Mr. Thomas had lived in the home for multiple years without this kind of abuse having taken place. Even the children reported only whippings on the bottom. And then 81 days after the DCFS file was closed, JW was beaten so severely that he dies. He has multiple brain hemorrhages, kidney lacerations, a broken rib, multiple fractures, multiple bruises and abrasions. There's no evidence that any kind of beating like that took place before the DCFS got involved. Turning to the amended complaint, if we were allowed to file that, we filed a Rule 59 motion to alter the judgment asking that the dismissal of the complaint be reversed and as additional relief that we be given leave to file a third amended complaint. As the District Court acknowledged, the second amended complaint did cure deficiencies that the District Court noted in the original complaint. But because she expressed some lack of certainty that the allegations could survive and proceed to trial, she allowed a second amended complaint. And then the third amended complaint that she would not allow us to file provided additional facts on the things that the District Court specifically said were problematic to her. One in particular is the District Court believed our second amended complaint alleged no interview took place. First, that's not how the allegations at issue should be read. The allegations at issue do specifically say the DCFS investigator began an interview. The allegations then say it was immediately or promptly cut off by the mother because she was uncomfortable about the children being interviewed in her and Thomas' presence. That alone we see as a huge red flag. No matter how much or how little information the investigator got from the children during that in-home interview, they were confronted, they were questioned about the people standing right there watching the interview about any abuse that was taking place. That is a documented danger-increasing act that is something that is clearly known to lead to increased risk to children. And so the District Court judge, however, felt that no interview took place. That's truly what her conclusion was, despite allegations that say an interview was begun and quickly cut short. So our third amended complaint fleshed that out. It detailed facts that the investigator obtained from the children during the interview. She asked the children, does Mr. Thomas live here in the house? The children told her yes. That's enough, Your Honors. That is enough to say that an interview took place. And case law says that regardless of the amount of information gleaned from the victims, the very fact of an interview in the abuser's presence is a danger-increasing act. So our third amended complaint did flesh out some additional details, so it could cure the deficiencies, if any, that still existed according to the District Court. The District Court also, we believe, the ultimate problem with the opinion is that the court went on to make, because the court did ultimately conclude that some affirmative acts were alleged. So the court went on to make causation determinations. And her causation determinations were based in large part on the passage of time between the DCFS Act and what we believe was a lack of understanding regarding the impact of the DCFS actions on the course of this investigation. So those are the type of events or activities that will absolutely be fleshed out in discovery. How the classification of the children as safe could impact the entire course of an investigation, it's alleged, but our third amended complaint goes into greater detail on that. So we do feel that the third amended complaint, first, we disagree that the second amended complaint is insufficient. It is in no way an insufficient complaint. It complains numerous allegations. It absolutely meets the standards of Rule 8 and Rule 12b-6. The true fault the court found with it was in causation, in alleging facts that could plausibly establish causation. And we believe that the gap in time between the closure of the investigation and J.W.'s fatal beating is not large enough that any bright-line rule could be established, saying 81 days is too long to say that these acts caused the child's death. We're dealing with a violent criminal here. How can any court looking at the papers with no discovery say that 81 days, oh, Mr. Thomas surely cooled off and none of what DCFS did or didn't do impacted his thinking or his treatment of J.W.? Would you like to reserve the remainder of your time? I will. Thank you, Your Honor. Thank you, Ms. Bartolucci. Mr. Freilich, we'll move to you now for argument on behalf of the appellees. Good morning, Your Honors, and may it please the Court. Matt Freilich for the State of Illinois. We ask the Court to affirm the District Court's judgment. The District Court correctly granted the State Defendant's motion to dismiss because the operative complaint did not state a substantive due process claim against them. Based on the allegations in that complaint, that legal theory was foreclosed by the Supreme Court's decision in Descheny v. Department of Social Services, which holds generally that state officials cannot be held liable for private acts of violence. Nothing materially distinguishes this case from Descheny. In both this case and Descheny, the defendants were a group of state child services workers who investigated a report of child abuse. In both cases, the ultimate harm alleged was an attack on a child by a private actor. And in both cases, the claim was that the state child services workers failed to prevent the attack from happening. What happened to J.W. in this case was tragic and horrific, but the actions by the case workers in this case implicate the Constitution no more than the actions of the defendants in Descheny did. Here we do have some affirmative acts alleged that seem to be different from Descheny. So can you address that? It seems not quite fair to say this is the exact same case as Descheny, which I hear you to be arguing. Of course not, Your Honor. I don't think the case is completely identical to Descheny, but I think it is worth noting that there were some facts in Descheny that could be construed as having increased the danger to the child in that case. For example, the boy in Descheny was in temporary protective custody in the hospital, and the defendants made the choice to turn him back over to his father, who was suspected of abusing him. Additionally, there was a case worker who did visit the child in his home. I think this was after the hospital visit and did observe the child, I think, with bruises. So I think the predicate facts could have been there in Descheny for a state-created danger claim there, too, but the Supreme Court didn't recognize one. But, of course, there are factual distinctions, and I think the district court correctly understood that the things that were theorized as danger-creating acts did not actually plausibly state a claim of state-created danger. So turning first to the allegation. Counsel, speaking about state-created danger, you know, your brief focuses a lot on the timing, and it is true that in the cases where we have found a state-created danger, either pled or denied summary judgment or affirmed the denial of summary judgment, that the time period was quite short, right? So I guess a hypothetical to you. If there was violence in the home the night of the interview in front of the abuser, would that change your view of the case in terms of pleading causation? Yes, Your Honor. It would change the view. I don't know. I mean, it's hard to speak about hypotheticals because there are— So I guess to counsel's point, where is that line for the state here? You're saying it's not at 81 days. You said it is at same day. Where is the line? I don't think there is a bright line, Your Honor. I think whether a plaintiff has alleged proximate causation in the state-created danger context just depends on what are the reasonable inferences to draw from the other facts in the complaint. So I think the time period is one thing that is relevant in that analysis, but it also depends on other things. So, for example, if there was a similarly long gap of time between the challenged conduct and the ultimate harm that befell the plaintiff, if there were other events, intervening events that were pleaded that showed the existence of this continued and maintained causal link or things to just raise a reasonable suspicion that these two events did have something to do with each other, maybe the existence of this several-month time gap wouldn't matter as much. The problem with the complaint here is that it doesn't plead the existence of such intervening acts. It alleges, for example, with respect to Tanya Miller, that she visited the family, made 24-hour contact after the department received this report of child abuse, and then five months passed, and then, tragically, this murder occurred. But there are no facts suggesting that they had any link to each other. So I think the existence of five months' passage of time in the interim, I think, makes it less and less reasonable to draw an inference of causation. Well, two reactions to that. I mean, one, it really depends on what event you're looking at, because it's really two and a half months from when the state indicates to Pipes or Pipes and Thomas, depending on which complaint you're looking at, that abuse has been indicated, but the case has been closed. Okay? So there, if you start the timeline there based on the complaint, you're not looking at five months. You're looking at two and a half months. Two, my question is, how do we know that discovery won't uncover facts that support the causal link alleged in the complaint? Does the state foreclosing that possibility altogether? So I'll take your questions in the order you asked them, Your Honor. So with regard to Your Honor's first question about Shumate's discussion with Regina Pipes about closing the case with an indicated report of abuse, so it is true that there were only about two months that elapsed between that event and the murder. Even then, I would still note that in this Court's prior decisions, and there are very few of them that have allowed a plaintiff to proceed on a state-created danger claim, I think in all of those cases the gap has been at most 24 hours. So we don't have a case establishing this line or foreclosing things beyond a certain amount of time that I've seen. Have you seen something like that? No, Your Honor. I'm not aware of any case that draws a bright line. I'm just making the point because just looking at how this Court has resolved state-created danger cases in the past, that does seem to be a constant in all of them. So I don't think there was any question, at least in those cases, that the temporal proximity indicated a problem with causation. But here the time gap is much larger, and I think the Court would have to break new ground to accept that causation theory. And with regard to Your Honor's second question, I'm sorry, just before I move on, with regard to Shumate, yes, there were only about two months that elapsed between the indicated report and the murder. But again, since 1983 liability is individual, that only goes to Shumate's liability, and I think the case against her is significantly weaker than the case against Miller, who did have a five-month gap between the relevant conduct that she engaged in and the murder itself. I want to move on to Your Honor's second question about what discovery might reveal. It is absolutely conceivable that discovery could reveal other information, but the question is at this stage whether the plaintiff pleaded a plausible claim to begin with, and a plaintiff is never entitled to discovery just based on mere speculation without at least stating the facts to support a reasonable inference that the defendant actually did engage in the misconduct alleged in the complaint. And with respect to the Miller interview, the Shumate interview, the reporting deficiencies, and the indicated report, there's just not the necessary facts in the complaint to support a reasonable inference that any of the defendants committed a danger-creating act. With respect to Miller's home visit, for example, I think the first problem lies in paragraph 31 of the complaint, where the complaint explicitly states that Miller did not interview the children about domestic violence or abuse. So the only fair inference to draw from the complaint is that maybe Miller had some interaction with the children, again, conducting this 24-hour contact with the children that state law required her to conduct, but it doesn't support a reasonable inference, especially given that concession in paragraph 31 that Miller actually conducted the kind of interview that the complaint theorizes as being a danger-creating interview. Can you respond to Mr. Wright's actual argument about that, though? Because his actual argument is you can't unring that bell once the caseworker walks in so Pipes and Thomas know the home is under investigation, and once the caseworker indicates, I'm going to talk to the children, and once the caseworker sits down to talk through the harm at that, his argument is the harm is done at that point. It doesn't matter how deep into the interview Miller got for Thomas to sense a loss of control that DCF regulations say can lead to an increase in danger. So, Your Honor, I think it actually does matter what was actually discussed in the interview because it would be the content of that conversation that under the theory that's being described in the briefs, that would be what makes this cross over from a routine 24-hour contact, which happens thousands of times a year in these kinds of cases, to something that potentially was a little more suspicious. It's just inevitable that a caseworker who's showing up to make this 24-hour contact to determine whether they need to take the child into temporary protective custody or more immediate action needs to be taken, it's impossible to avoid just incidental contact or maybe even conversations with the child. What I think is the more serious allegation here, or the more serious legal theory, is the idea that Miller might have confronted JW, or the children at least, about being abused and potentially asked them if they were being abused in front of Tracy Thomas. But the complaint just doesn't support a reasonable inference that that happened. With regard to Miller's mere presence in the home itself being a danger-creating act, I just find that very hard to square with Wilson Trattner versus Campbell, where the victim did call the police, the police came to the house, the police even reprimanded the alleged abuser. Their conduct fell well short of an appropriate response, but they at least said, hey, stop contacting this woman, don't do this. That didn't work, and this person continued to engage in abuse. But those power dynamics were also present in Wilson Trattner. And I think there are other cases, too, where the person investigating a report that somebody might be violent does confront the person. So I just don't think it squares with this court's case law just to say that the mere presence of a caseworker in the home was enough to upset the power dynamic. I think the case would certainly be different if there were an affirmative allegation that Miller asked the children, like, are you being hurt by Tracy Thomas? Is he the one hurting you? But the complaint doesn't even make that allegation. It doesn't even make the allegation that it makes in paragraph 42 with respect to the Shoemate interview with the children at their school, where even the complaint says that Shoemate did ask the children about domestic violence or abuse. So the complaint could have pleaded the same thing in or around paragraph 31, where it talks about the Miller interview, but the complaint just doesn't do that. The complaint left it entirely for the district judge to draw that inference, and especially given the statement in paragraph 31 that the children were unable to be interviewed about domestic violence or abuse, the complaint just doesn't support that inference. And I do want to note that the theory that just the caseworker's presence in the home I don't believe Mr. Wright is arguing mere presence. I think what's clear from 31 is that Miller began an interview. Pipes stopped it. So I don't take their argument to be a mere presence, but I've heard your other answer to my question. Right. And so I apologize if I'm not being responsive to the question. So even just an interview about things other than domestic violence or abuse, I don't think would be enough just as a theory to state a plausible claim. But even putting aside the Danger-Creating Act requirement, I still think there are major problems with proximate causation, especially with the Miller interview, where there are five months of time that pass. There's no allegation suggesting that Thomas reacted to the Miller interview in particular. There are no allegations of any intervening acts that suggest any kind of causal link. Regardless of whether there's a bright line or not, this amount of time without any other suggestion of a connection just isn't enough to establish a proximate cause. This court in Buchanan-Moore versus County of Milwaukee, for example, resolved a case that was decided on a Rule 12 motion based entirely on the proximate cause element because there was just this lack of connection. And then finally, the court would also have to confront the shocks to conscience element. And regardless of whether Miller's conduct during the September home visit was fully consistent with department best practices, it falls well short of intent to inflict harm or a criminally reckless infliction of harm in the constitutional sense. That is that she knew that interviewing the child under those circumstances would create a serious risk of danger, and then went about doing it anyway. Miller was at the house conducting, making her first 24-hour contact in response to a report of child abuse, where she had to gather information and she had to do her best under the circumstances. I think at most the complaint, what can be fairly inferred from the complaint is possibly allegations of negligence, but they fall well short of the shocks to conscience standard that this court has used to evaluate state-created danger claims in prior cases. If the court has no further questions, we respectfully ask that the court affirm the district court's judgment. Thank you, Mr. Freilich. Ms. Bartolucci, we'll move to you now for rebuttal argument. Thank you. I'll just briefly turn to the complaint allegations that we were just discussing. The paragraphs that issue say that Miller began an interview, quote, began an interview with the children while the abusers were nearby and watching carefully. I don't believe I've ever seen a reference to this initial routine 24-hour contact. I don't think I've ever heard that phrase before. And certainly, because this was DCFS's first intervention, there's no reason Mr. Thomas would think this is a routine 24-hour contact. The only thing he knew is Miller came to the home, sat the children down, and asked them specifically, according to our third amended complaint, does he live here? That told Thomas he was the subject of the investigation, or at least a subject of the investigation. Going to counsel's argument on causation about the lack of any allegations of abuse between December of 2021 and the fatal beating of February 2022, there was evidence that's fled in the complaint of, according to the autopsy report, JW had bruises and evidence of previously inflicted harm. So, but the sad irony is there are no allegations of that because DCFS was no longer involved, so nobody knew about that interim abuse. DCFS stopped their investigation in December 2021. He was fatally beaten in February 2022, found with bruises and evidence of intermittent abuse. So it did occur. There is evidence that he was abused between December and February, but of course we can't allege that anybody knew about it because DCFS wasn't there. They were gone. They had closed their investigation. So I don't necessarily think those intermittent allegations of abuse are necessary to establish causation, but they can be inferred from the bruising and evidence of past abuse. And then I appreciate that Deshaney has been brought up because I think it's eminently clear from the Deshaney decision that rather than foreclosing this claim, it opened the door to it. In the Deshaney complaint, the plaintiff never even alleged that the state caused or increased the danger to the child victim. That was not alleged. It was also a summary judgment ruling. There was no evidence put forward that the state increased the danger to the child. So counsel says, well, there were ostensibly affirmative acts conducted by the defendants there, but the plaintiff didn't allege it. She alleged some affirmative acts, but she never said they increased or caused the danger to the child. So this case, I mean, I counted. We have at least 10 to 20 allegations that the defendant's acts caused or increased the risk to JW. If a plaintiff alleges causation, that allegation has to be accepted as true at this juncture unless it is so implausible on its face. And we have given a plethora of allegations regarding exactly why the causation allegations are not implausible. They are very plausible. Counsel, let's assume that I buy the argument that you've stated a claim. What about qualified immunity? Because I see you going to the Sixth Circuit for some legal arguments, and so I don't. What is the clearly established right here, and why isn't this appropriate to grant summary judgment for the defendants here? Well, Your Honor. Qualified immunity, excuse me. Right. As the Court knows, and we've stated in our brief, qualified immunity can be very heavily fact-dependent. And one of the key areas of facts that are relevant are— But what about the law? We need to find the law. The law is, A, is there a constitutional right that was violated? Well, what's the law that put these defendants on notice that if taking as true what you've alleged, that there was a violation of a constitutional right? We spell out in our reply brief initially the decision in DeShaney, which I think in black and white terms opened the door to the state-created danger doctrine. That's quite a stretch. That's quite a stretch, right? Because that, I think, would have the opposite effect on a reasonable defendant. We'll put them on notice that their conduct was unconstitutional as alleged in the complaint. Then we look to the Seventh Circuit's precedent. We'll go to Reed v. Gardner, where the state-created danger doctrine was adopted. We have the Monfils v. Taylor case. We have several cases since DeShaney where the Court did accept that doctrine. But not in the child protection context. Is that correct? You've cited Lipman from the Sixth Circuit, but you haven't cited anything from our circuit. Correct. There isn't one in the Seventh Circuit in a child protection context. We did bring in the Lipman case from the Sixth Circuit. But I do argue that cases such as Monfils v. Taylor establish that when an investigation conducted by people tasked with protecting the public, such as the police or DCFS, is conducted in a way that increases the danger to victims, and there's case law that says that, it puts anybody who's in that realm, who fits in that category of defendant, on notice that if you do not proceed accordingly and with due care, I won't use due care. That's negligence. If you take acts that increase the danger to the suspected victim of abuse, and you know that they can because you are trained. As a DCFS employee, you have been trained and told in black and white writing that these acts, the acts that these people committed can increase the danger of retaliation and increase the danger to a child. When you're told that in your training and the case law tells you that if you take acts that increase the danger to the child, you can be constitutionally liable, that's well established law. And that's a clearly established right to life. I don't think that's in question. So the true crux of the qualified immunity issue is going to be what these defendants knew and how they were trained and what they believe their actions could result in. Thank you, Ms. Bartolucci. Thank you, Mr. Freilich. The case will be taken under advisement. Thank you. That will complete the court's hearings for today. Thank you.